[Cite as *State v. Sanderson*, 2026-Ohio-2911.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

STATE OF OHIO

    Appellee

v.

GARY SANDERSON

    Appellant

C.A. No.    31588

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CR-2025-01-0056

DECISION AND JOURNAL ENTRY

Dated: July 29, 2026

HENSAL, Judge.

{¶1} Gary Sanderson appeals from the judgment of the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} C.H. ("Husband") owns a small business and was awarded a contract with the City of Akron ("the City"). The City would notify him of condemned properties that needed to be secured, and he would complete the board up. It is undisputed that the City sent Husband to secure a house owned by Mr. Sanderson. The City condemned the house three months before Husband arrived to secure it.

{¶3} Husband brought his wife, M.H. ("Wife"), with him to secure Mr. Sanderson's home. When they arrived, they repeatedly announced their presence before securing the back door. They then moved to a side door. At the side door, they encountered Mr. Sanderson, who was still inside the house.

{¶4} At trial, the accounts of the events that unfolded varied. According to Husband and Wife, they had a brief exchange with Mr. Sanderson before he pulled a gun from his pocket, they ran, and he fired his gun. It was their testimony that Wife also had a gun and, after she ran, she fired it at Mr. Sanderson. According to Mr. Sanderson, he was holding a gun when he came outside and only used it to shoot Husband after Husband shot him in the leg. The evidence showed that Husband sustained a gunshot wound to the back, and Mr. Sanderson sustained a gunshot wound to the leg. Following the shooting, Mr. Sanderson reentered the house, and Husband and Wife remained near their truck.

{¶5} Both Wife and a nearby neighbor called 911 to report the shooting. The police arrived, and Husband was transported to a hospital for treatment. Approximately 45 to 50 minutes elapsed before Mr. Sanderson emerged from the house. After speaking with the parties involved and observing the scene, the police arrested Mr. Sanderson.

{¶6} Mr. Sanderson was indicted on two counts of felonious assault and a land use violation. His indictment also included two firearm specifications and specifications for the forfeiture of his firearm. After a jury found him guilty, the court sentenced him to an indefinite term of 9 to 10.5 years in prison.

{¶7} Mr. Sanderson now appeals his convictions and raises two assignments of error for review. To facilitate our review, we rearrange the assignments of error.

II.

ASSIGNMENT OF ERROR II

THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT
SANDERSON'S USE OF DEADLY FORCE WAS NOT IN SELF DEFENSE
AND HIS CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE
EVIDENCE.

{¶8} In his second assignment of error, Mr. Sanderson argues that his felonious assault convictions are against the manifest weight of the evidence. When considering a challenge to the manifest weight of the evidence, this Court is required to consider the entire record, "weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist. 1986). "A reversal on this basis is reserved for the exceptional case in which the evidence weighs heavily against the conviction." *State v. Croghan*, 2019-Ohio-3970, ¶ 26 (9th Dist.).

{¶9} Mr. Sanderson argues that the State failed to establish he did not act in self-defense when he shot Husband and attempted to shoot Wife. Self-defense is an affirmative defense in Ohio. *State v. Messenger*, 2022-Ohio-4562, ¶ 24. "[A] defendant charged with an offense involving the use of force has the burden of producing legally sufficient evidence that his use of force was in self-defense." *Id.* at ¶ 25. Once a defendant satisfies his burden of production, the burden of persuasion shifts to the State "to prove beyond a reasonable doubt that the accused did not use force in self-defense." *State v. Brooks*, 2022-Ohio-2478, ¶ 6. The State's burden "is subject to a manifest-weight review on appeal . . . ." *Messenger* at ¶ 27.

{¶10} The elements of self-defense are:

(1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger.

*Id.* at ¶ 14, quoting *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002). "To carry its burden of persuasion, the State need only disprove one of the foregoing elements beyond a reasonable doubt." *State v. Fleckenstein*, 2023-Ohio-4347, ¶ 24 (9th Dist.).

{¶11} Wife testified that she frequently accompanied Husband when he went to secure condemned properties. She described Mr. Sanderson's house as being on a corner lot with its front door facing one street and its side door facing another. The evidence showed that she and Husband arrived at the house just before 3:30 p.m. when it was still light outside. Husband parked their bright red truck on the street next to the side of the house. Wife testified that she was wearing a black coat that day, but Husband was wearing a bright green hooded sweatshirt, khaki pants, and a utility belt equipped with a hammer and drill.

{¶12} Wife testified that she and Husband approached the house and announced themselves. Husband yelled out multiple times, "Akron board-ups. If anybody is here, you've got to go." They also walked around the house, and Wife photographed its front. After doing so, they proceeded to the back door.

{¶13} Wife recalled Husband having to straighten the back door by either hammering or kicking it. He then used his DeWalt drill to install several screws in the door and secure it to the frame. Wife photographed the newly secured door before walking toward the side door of the house.

{¶14} Wife testified that the side door of the house also needed to be secured because it was not fully closed. She remembered approaching the side door with Husband and noticing a man in the window of the door. According to Wife, she and Husband identified themselves, told the man he was not allowed to be there, and instructed him to come out. She later identified the man as Mr. Sanderson.

{¶15} Wife testified that Mr. Sanderson walked outside, and they once again explained why they were there. When they asked him how many people were inside the house, he responded, "there's a lot of us in here and we're not leaving." Wife testified that she looked down at her phone with the intention of calling the police. While focused on her phone, she heard Husband ask Mr. Sanderson if he had a knife. Wife then looked up and saw Mr. Sanderson removing a gun from his pocket. She testified that he pointed the gun as she and Husband ran.

{¶16} Wife testified that she and Husband ran in opposite directions. She recalled him running toward the back of the house while she ran toward the street where their truck was parked. As she ran, she heard at least two gunshots. She testified that she had a concealed carry permit and kept a gun in her pocket. She remembered removing the gun, taking cover behind their truck, and shooting back toward the house. Wife testified that she continued to fire until her gun was empty. From her position, she saw Mr. Sanderson stumble and reenter the house through the side door. Wife then heard Husband yell that he had been shot.

{¶17} Wife remembered calling Husband over to her as she used her phone to contact 911. The State played her 911 call at trial. Wife told the dispatcher that she and Husband were securing a house for the City when a man emerged, said there were many people inside the house, began shooting at them, and shot Husband as he was running away. Wife told the dispatcher that she also had a gun. Wife testified that she placed the gun inside their truck on the passenger's seat. She denied that Husband ever had the gun that day or used it to shoot Mr. Sanderson. Wife explained that she had a concealed carry permit and, for safety reasons, routinely carried a gun when she and Husband secured condemned properties.

{¶18} Husband confirmed that he and Wife went to Mr. Sanderson's home to secure it for the City. He stated that, after they arrived at the house, he repeatedly yelled "Akron board-ups. If

anybody [is] in there, you guys need to come out." He then proceeded to secure the back door. Husband testified that he made a significant amount of noise when he secured the back door because he had to force it back into the frame and drill several screws into it. He indicated that he was still holding the drill when he walked over to the side door.

{¶19} Husband initially testified that he saw a shadow inside the house at the side door before touching it. He later admitted that he might have started drilling the side door before he realized someone was inside. It was Husband's testimony that, once he realized someone was inside, he explained who he and Wife were and why they were there. He said that Mr. Sanderson then came out and claimed there were "a lot of other people" inside the house. In response, Husband repeated that anyone inside the house had to leave because they were there to secure it. Husband testified that Mr. Sanderson began thumbing his pocket, so he asked Mr. Sanderson whether he had "a knife or something[.]" Mr. Sanderson replied that he had a gun and pulled it from his pocket.

{¶20} Husband testified that he ran the opposite direction from Wife when Mr. Sanderson lifted his gun. As he ran, he heard gunshots. Husband felt something warm on his back but did not initially realize that he had been shot. It was his testimony that Wife began shooting at Mr. Sanderson with her own gun. When the shooting stopped, Husband heard Wife calling him back to the truck.

{¶21} Husband admitted that he knew how to shoot a gun and had shot Wife's gun before at the range. He denied that he had the gun during this incident or that he shot Mr. Sanderson. According to Husband, his drill was the only item he had in his hand when the shooting occurred. The police found Husband's drill lying on the hood of his truck.

{¶22} A neighbor who lived diagonally from Mr. Sanderson called 911 in response to the shooting. The neighbor told the dispatcher that he was downstairs when he heard gunshots. He told the dispatcher that he ran upstairs to look outside but tried not to get too close to the window. From his house, he saw a man, a woman, and a red truck. He told the dispatcher that he saw the man with a gun. He indicated that the man and women did not appear to be arguing. Instead, they were standing near the truck visually scanning one another. The neighbor agreed with the dispatcher when she suggested that the two might be looking for injuries.

{¶23} The neighbor also testified at trial. He testified that he was in his basement when he heard gunshots. He then ran upstairs and looked out his window. He testified that he saw a man running and, after a short while, the man came back toward a truck parked in the street. According to the neighbor, a woman met the man at the corner of the street, and they walked to the truck together. While the neighbor told the 911 dispatcher that he saw the man holding a gun, the neighbor testified that he was unable to say what was in the man's hand. He testified that he saw "something" in the man's hand and, because of the gunshots, "the natural instinct [was] to think that there's a gun there." The neighbor admitted that he could not be certain the man had a gun.

{¶24} Detective Adam Clark, a member of the crime scene unit, testified that he helped process the scene after the shooting. He testified that the police found a total of twelve casings from .40 caliber bullets. Two of the casings were found in an area near the side door of Mr. Sanderson's house, and ten of the casings were found in the street near the truck. Testimony and evidence established that the gun taken from inside Husband's truck was a .40 caliber semi-automatic. Detective Dan Gump, another member of the crime scene unit, testified that the gun was not loaded when the police confiscated it. He tested the gun and confirmed that it was

operable. He also tested a .25 caliber semi-automatic gun for which Mr. Sanderson claimed ownership. Detective Gump confirmed that the gun was operable and had ammunition in it when the police confiscated it.

{¶25} Although two .40 caliber casings were found on the ground near the side door of Mr. Sanderson's house, Wife did not recall firing the gun in that location. She remembered it taking a few seconds to pull the gun from her pocket and firing it once she got closer to the truck. It was Wife's testimony, however, that she went into "panic mode" when Mr. Sanderson began shooting because it was "the most stressful situation that [she had] ever been in." Detective Joseph Smith, the lead detective who later interviewed Wife, testified extensively about the effect critical incidents can have on an individual's perceptions and ability to recall events. He indicated that the two .40 caliber casings nearest the side door might have been there because Wife began shooting sooner than she thought or because someone had kicked them. Detective Smith noted that, while Mr. Sanderson admitted shooting his gun near the side door, the police never found any .25 casings. He testified that he was not surprised by that lack of evidence because the casings were small and the scene was littered with significant debris.

{¶26} When Detective Smith arrived on scene, Wife was there but Husband had already been taken to the hospital. The detective had Wife transported to the police station for her interview. He testified that, at first, Wife, she did not want to admit that she had fired a gun at Mr. Sanderson. It was the detective's impression that she did not want to get in trouble for making that admission. As their interview continued, however, Wife admitted that she had fired the gun during the incident.

{¶27} Detective Smith testified that he ultimately spoke with Husband as well and found his and Wife's stories to be consistent. When he spoke with Husband, he informed Husband that

a witness had seen him holding a gun. The detective testified that Husband denied holding a gun that day but suggested that the witness may have seen him holding his drill. Detective Smith confirmed that the police found Husband's drill resting on the hood of his truck.

{¶28} Detective Smith testified that the police tested the .40 caliber gun found inside Husband and Wife's truck for DNA. The tests revealed that both of their DNA was on the trigger. Nevertheless, Detective Smith testified that Husband admitted to having shot the gun before at the range. The detective found it unsurprising that both Husband's and Wife's DNA was on the gun because they had both used it before and "called it a family gun . . . ."

{¶29} Detective Smith testified that he spoke with Mr. Sanderson and his brother, who was also present inside the house when the shooting occurred. He testified that, unlike Husband's and Wife's stories, the two men's stories were not consistent. Specifically, the information Mr. Sanderson relayed to his brother was different than the information Mr. Sanderson relayed to Detective Smith. Based on his investigation, the detective determined that Mr. Sanderson and his brother were still living inside the house even though it had been condemned. He testified that he never entered the house, but its exterior did not show signs of any repair work.

{¶30} Officer Alexander McGarvey responded to the scene and entered the house to conduct a safety sweep. He indicated that the interior was devoid of any sign of repair work. He testified that there were areas inside the home where the trash "was . . . almost hitting the ceiling because there was so much built up on the floor." Detective Clark, who entered the house with the crime scene unit, testified that the amount of trash and clutter inside the house placed it among the "top three . . . bad house[s]" he had been inside during his 30 years as an officer.

{¶31} On cross-examination, Detective Smith acknowledged that Mr. Sanderson called 911 immediately after the shooting and reported that a man had shot him. The Detective also

noted, however, that Mr. Sanderson told the dispatcher he had encountered two men outside his house. He did not recall Mr. Sanderson mentioning a female when speaking with the dispatcher. The 911 call itself was never introduced into evidence.

{¶32} Mr. Sanderson testified that, on the day of the incident, he was at the house preparing it for repairs. He testified that the first noise he heard was the sound of banging on his side door. He denied hearing any announcements about board ups or activity at the back door. Because his house had been broken into before, Mr. Sanderson testified, he grabbed his gun before heading to the side door. It was his testimony that Wife spoke with him through the side door and told him to exit the house via the front door. He then informed her that he was unable to use the front door because it was barricaded from the inside. According to Mr. Sanderson, Husband had to use a power tool to open the side door because Husband had already partially secured it. Once Husband freed the door, Mr. Sanderson stepped outside.

{¶33} Mr. Sanderson testified that he held his gun down at his side while speaking with Husband and Wife. He admitted telling them there were "a whole bunch of us" inside the house. He said he did so because he did not know what was happening. According to Mr. Sanderson, he tried speaking, but Wife repeatedly interrupted him to say that everyone needed to come out of the house. He testified that, while they were standing there, Husband asked him "real mean like" why he had a knife in his hand. Mr. Sanderson then answered, "it's not a knife. It's a gun." According to Mr. Sanderson, Husband responded by shooting him in the leg.

{¶34} Mr. Sanderson testified that Husband moved very quickly and shot him before he had a chance to react. He then returned fire. Mr. Sanderson said Husband ran toward his truck but continued to shoot as he ran. Mr. Sanderson testified that he limped back inside the house as

Husband ran, so he did not see what happened afterward. It was his testimony that he never fired his gun at Wife because she never had a gun or shot at him.

{¶35} A housing code compliance inspector for the City confirmed that he condemned Mr. Sanderson's house three months before the shooting occurred. He testified that he condemned the house because the City ordered repairs the previous year and no repairs had been made. The house inspector testified that no one was allowed to be at the property after it was condemned. The only exception was if an individual was making repairs to the property between the hours of 7:00 a.m. and 7:00 p.m. The housing inspector and multiple police officers confirmed that there was no evidence of any repairs being made to the property at the time of the incident.

{¶36} It is within the province of the trier of fact to reconcile inconsistencies in testimony because the finder of fact is present to "view witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Cook*, 2003-Ohio-727, ¶ 30 (9th Dist.), quoting *Giurbino v. Giurbino*, 89 Ohio App.3d 646, 659 (8th Dist. 1993). The jury in this case was "free to believe all, part, or none of the testimony of each witness." *Prince v. Jordan*, 2004-Ohio-7184, ¶ 35 (9th Dist.), citing *State v. Jackson*, 86 Ohio App.3d 29, 33 (4th Dist. 1993). "A conviction is not against the manifest weight because the jury chose to credit the State's version of events." *State v. Peasley*, 2010-Ohio-4333, ¶ 18 (9th Dist.).

{¶37} Upon review of the record, we cannot say the jury lost its way when it determined that the State proved Mr. Sanderson did not act in self-defense. The jury was essentially presented with two conflicting versions of the events. Husband and Wife both indicated that Mr. Sanderson fired his gun at them after they demanded that he leave the house. Meanwhile, Mr. Sanderson claimed Husband shot him for no reason while he was holding a gun down to his side. The jury

heard testimony that the house was extremely cluttered with garbage and debris and showed no sign of any repairs, despite Mr. Sanderson's claim that he was there to initiate repair work. They also heard testimony that, while Husband's and Wife's versions of the events were consistent, Mr. Sanderson's was not. Detective Smith specifically testified that the information he received from Mr. Sanderson was different than the information Mr. Sanderson gave to his own brother. Given the evidence introduced at trial, the jury reasonably could have chosen to credit the State's theory that Mr. Sanderson was the initial aggressor, and thus, was at fault in creating the situation leading to the affray. *See Peasley* at ¶ 18; *Messenger*, 2022-Ohio-4562, at ¶ 14. Mr. Sanderson has not shown that this is the exceptional case where the evidence weighs heavily against his convictions. *See Croghan*, 2009-Ohio-3970, at ¶ 26 (9th Dist.). Accordingly, his second assignment of error is overruled.

ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED WHEN IT STRUCK THE TESTIMONY OF C.H. AS TO WHETHER HE WAS PERMITTED TO POSSESS A FIREARM[.]

{¶38} In his first assignment of error, Mr. Sanderson argues the trial court erred when it struck a response during his cross-examination of Husband and refused to let him question Husband on that point. For the following reasons, we reject his argument.

{¶39} "This Court generally reviews a trial court's decision to admit or exclude evidence for an abuse of discretion." *State v. Hartwell*, 2025-Ohio-2278, ¶ 18 (9th Dist.). A court's evidentiary ruling is only subject to reversal if the court abused its discretion and the ruling materially prejudiced the defendant. *State v. Ivery*, 2018-Ohio-2177, ¶ 23 (9th Dist.), quoting *State v. Martin*, 19 Ohio St.3d 122, 129 (1985). An error is harmless if the State shows "that the error did not affect the defendant's substantial rights." *State v. Bond*, 2022-Ohio-4150, ¶ 7. An abuse

of discretion implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶40} At the start of trial, the State moved in limine to exclude any references to Husband's criminal record. The prosecutor informed the court that Husband had never been convicted of a felony and had a misdemeanor record that was inadmissible. After Mr. Sanderson said he had no objection to the State's motion, the trial court granted it.

{¶41} When defense counsel cross-examined Husband, the following exchange occurred:

[DEFENSE COUNSEL:] And now, [Wife] had a weapon on her that day, correct?

[HUSBAND:] Yes, sir.

[DEFENSE COUNSEL:] You don't have a weapon?

[HUSBAND:] No, sir.

[DEFENSE COUNSEL:] Can you legally have a weapon?

[HUSBAND:] Not right now. I'm on probation.

The State immediately objected to the foregoing exchange. It argued that Mr. Sanderson's final question insinuated that Husband had a criminal record. Mr. Sanderson responded that he did not ask Husband about his criminal record and that Husband could have answered his question without discussing his record. After hearing from both parties, the trial court found Mr. Sanderson's question to be an attempt to introduce Husband's criminal record into evidence. The court sustained the State's objection and ordered the jury to disregard Husband's answer.

{¶42} On appeal, Mr. Sanderson argues the trial court erred when it struck Husband's answer and refused to let him question Husband about whether he could legally possess a gun. Mr. Sanderson maintains that he did not ask Husband about his criminal record. He argues that, regardless of the reason Husband could not legally have a gun, that fact bore upon his credibility. According to Mr. Sanderson, if Husband could not legally possess a gun, he and Wife had a motive

to lie about Husband having a gun and using it to shoot him. He argues that Husband's answer to his question was directly relevant to his claim of self-defense and its probative value exceeded any prejudice it may have caused.

{¶43} Assuming without deciding that the trial court erred by striking Husband's answer to Mr. Sanderson's question, we cannot conclude that the error materially prejudiced Mr. Sanderson. *See Ivery*, 2018-Ohio-2177, at ¶ 23 (9th Dist.), quoting *Martin*, 19 Ohio St.3d at 129. Husband and Wife were both insistent that Wife was the one holding the gun and that she only fired it after Mr. Sanderson shot at them. The jury heard testimony that their stories were consistent, matched information Wife relayed to the 911 dispatcher within minutes of the shooting, and matched at least some of the physical evidence in that Husband sustained a gunshot wound to the back and the police found ten .40 caliber casings in the area where Wife said she was standing when she fired the gun. Meanwhile, the jury heard testimony that Mr. Sanderson was illegally living in his condemned house, the house showed no signs of the repairs he claimed to be readying, and the information he relayed to his brother about the incident was not consistent with the information he relayed to the police. Even if Mr. Sanderson had managed to elicit a possible motive for Husband and Wife to lie about Husband's use of the firearm, there were numerous issues with his own credibility. Under these particular facts and circumstances, we cannot conclude that the trial court's error, if any, affected Mr. Sanderson's substantial rights as the jury still reasonably could have concluded that he was the initial aggressor. *See* Discussion of Assignment of Error Number Two, *supra*. Accordingly, his first assignment of error is overruled.

III.

{¶44} Mr. Sanderson's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JENNIFER HENSAL
FOR THE COURT

FLAGG LANZINGER, P. J.
SUTTON, J.
CONCUR.

APPEARANCES:

NATHAN A. RAY, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and AMANDA R. FILIPPI, Assistant Prosecuting Attorney, for Appellee.